## The United States District Court for the Western District of Pennsylvania

Michelle Mason,                                   2:19-cv-00973-CB

                       Plaintiff,        Jury Trial Demanded

     v.

Lowe's Companies, Inc.;
Lowe's Home Centers, LLC;
Tim Stratton; Joe Becton;
Stephanie Miller; John P.
Morone; and Andrea DeJohn,

         Defendants.

## Plaintiff's Brief in Opposition to Defendants' Motion to Compel Arbitration and to Dismiss or, in the Alternative, to Stay (ECF 26)

### I.   Statement of Facts

In a tenure with Lowe's that lasted just shy of six years, Michelle Mason established herself as one of its highest performing and most successful retail store managers in the entire country. First Amended Complaint (ECF 25), ¶¶11; 13; 36; 88; 95; n. 1 & 3. But a chain of events that began in the fall of 2017, when Mason accepted a transfer to manage Lowe's Store 653 in Cranberry, Pennsylvania ("653"), would lead only eight months later to the destruction of her career.

Prior to Mason's taking over its reins, 653 had earned a dubious company-wide reputation as a "broken" store. Joe Becton, the Regional Market Director (and Mason's direct supervisor), knew in the fall of 2017 that he had to quickly bring about a reversal in 653's fortunes or face termination himself. Desperate to keep his

job, he begged Mason, then a 50-year old rising star in the company, to come to his rescue and agree to replace 653's existing Store Manager. ECF 25, ¶¶14-16.

Once ensconced at 653, however, Mason soon discovered that Becton's method for overseeing the store's turnaround was to abuse and harass the older women who worked there, Mason in particular. Becton quickly revealed that he was not only a misogynist, but a tyrant as well, one who regularly condescended, insulted, and yelled at Mason when he wasn't otherwise interfering with her operation of the store, via micro-managing and arbitrary demands. *Id.*, ¶¶20-26.

Barely five months into her tenure at 653, Mason had reached a breaking point. She first requested a meeting with the Regional Vice President for Human Resources, John Morone. The two met face-to-face for ninety minutes on April 2, 2018, at which time Mason recounted Becton's abuse in detail. Morone told Mason he would look into her complaints, but in reality, he buried them. *Id.*, ¶¶28-32.

A month and a half later, during the week of May 14, 2018, Mason provided a similarly lengthy account of Becton's harassment and abuse in a phone call with Lowe's Corporate Director of Employee Relations, Stephanie Miller. But on that occasion Mason went even further than she had with Morone. Mason stressed to Miller that the hostile work environment she'd endured could not be laid exclusively at Becton's feet, because two other high-ranking Lowe's officials had both enabled and perpetuated it: Morone, who, according to Mason, had conducted nothing more than a sham investigation following his April 2nd meeting with Mason; and Tim Stratton, a Regional Vice President who, like Morone, had been aware of Becton's

harassment of subordinates for at least two years, and had failed to take any corrective action against Becton. *Id.*, ¶¶41-46.

Miller assured Mason that Lowe's would conduct a good-faith investigation into her allegations. But Miller's promise was just as false as Morone's. Indeed, less than three weeks following the phone call with Miller, Lowe's decided to fire Mason in retaliation for her complaints to Morone and Miller. No later than June 1, 2018, Lowe's confidentially notified Todd Young, a 43-year old Store Manager from State College, that it had selected him to replace Mason at 653, with Young confirming as much in a cryptic Facebook message he posted that same day. *Id.*, ¶¶47; 77-78.

Ten days after Young's announcement, Lowe's authorities embarked on a campaign to fabricate a case against Mason, one that would ostensibly justify her firing seventeen days later. On June 11, 2018, various HR and Loss Prevention personnel descended on 653 and began building a dossier against Mason that was, by any objective measure farcical; more to the point, these efforts were transparently pretextual, because they followed rather than preceded the selection of Young to replace Mason. *Id.*, ¶¶47-75.

On June 28, 2018, Lowe's fired Mason, directing Becton to tell her, falsely and without further elaboration, that she had engaged in "dishonesty." *Id.*, ¶76.

In its Motion to Compel Arbitration, et al. (ECF 26) ("Motion to Compel"), Lowe's contends that an agreement Mason purportedly accepted in late March 2018 bars her lawsuit in this Court.

As pertains to the Motion to Compel, the "Agreement to Arbitrate Disputes" ("the Agreement")(ECF 25-2)–every word of which was drafted by Lowe's, and

presented to Mason on a take-it-or-leave-it basis–announces both the underlying consideration for the pact, as well as the parties' respective duties moving forward.

   As explained in the following paragraphs, Lowe's has committed material breaches of the Agreement which, according to Pennsylvania law, relieve Mason of any duty to perform, including the specific duty that she submit her case to arbitration.

   The Agreement declares its underlying consideration,[1] consisting of either two or three elements, in the opening paragraph:

> In exchange for [1] the mutual promises in this Agreement, [2] your continued employment by Lowe's Home Centers, LLC and its successors or assigns (hereinafter "Lowe's"), and [3] *your participation in the 2018 Manager Bonus Program...*[2]

(emphasis added). Immediately thereafter, the Agreement announces the parties' prospective–and, it should be emphasized, *mutual*–duties of performance:

> "...[Y]ou and Lowe's agree that *any controversy between you and Lowe's...arising out of your employment* or the termination of your employment shall be settled by binding arbitration...

(ECF 25-2 at 1, ¶1)(emphasis added).

---

[1]The import of the phrase "your continued employment by Lowe's Home Centers, LLC and its successors or assigns" is ambiguous, because it can be construed as opposing alternatives: a promise by Lowe's not to fire Mason if she signed the agreement, versus a threat to fire her if she refused. For this reason, Mason, who did not draft the language, submits that the ambiguity must be construed against the drafter, Lowe's. Accordingly, if the phrase is to represent a non-illusory promise of continued employment, then it necessarily follows that Lowe's–the only party in a position to pay Mason bonus–was obligating itself to not obstruct her efforts to earn extra compensation, including, as here, subjecting Mason to retaliatory discharge before she'd had the opportunity to earn even a dollar's worth of bonus pay.

[2] Based on Mason's past performance, both Lowe's and Mason contemplated in March 2018 that Mason would easily earn an additional 50% or more of her $100,000 base salary in bonus pay by the end of the year. ECF 25, ¶103.

Lowe's failed to furnish the consideration it promised in the Agreement. By firing Mason for entirely illegal reasons on June 28th–three months after she had signed the Agreement, and thus before she could have met any of the thresholds to qualify for bonus–Lowe's unilaterally deprived her of the inducement it had offered in exchange for her agreement, *viz*., the opportunity to earn bonus during fiscal year 18/19. ECF 25, ¶¶121; 100-08.

Moreover, Lowe's failed to abide by its duty under the Agreement to arbitrate whatever controversy had arisen between it and Mason *before* she was fired. By its own terms, the Agreement explicitly references and thus contemplates controversies arising during the course of employment, i.e., *prior* to termination. Specifically, the controlling phrase, "any controversy between you and Lowe's...[1] arising out of your employment or [2] the termination of your employment" clearly envisions two scenarios, set apart by the disjunctive "or": (1) controversies distinct from termination, arising while the employment relationship remains intact; and (2) controversies once the employment relationship has ended.[3]

As set forth in Mason's complaint, beginning no later than April 2, 2018, and continuing through June 28, 2018, there clearly arose a "controversy between [Mason] and Lowe's...arising out of [Mason's] employment." But Lowe's did not seek to "settle" that controversy through "binding arbitration." On the contrary: Lowe's

_____

[3]Mason anticipates that Lowe's may argue her construction of the controlling language would render the phrase "any controversy arising out of...the termination of your employment" superfluous, and should therefore be rejected. That contention misses the mark, however, because otherwise actionable controversies unrelated to the termination decision itself routinely arise post-termination, including allegations of defamation to a prospective employer, breach of the terms of a severance agreement or release, failure to return the employee's personalty, et al.

ignored its duty under the Agreement–namely, to present the controversy, including the evidence it had supposedly amassed against Mason, to an arbitrator for resolution. Lowe's resorted instead to self-help, unilaterally firing Mason on June 28th.

Stated another way, according to the express terms of the Agreement that Lowe's drafted and then demanded Mason accept, Lowe's promised to delegate *to an arbitrator* what had previously been within the company's sole prerogative: to act, or forbear from acting, upon any "controversy" arising between itself and Mason. In failing to honor its own promise, Lowe's deprived Mason of the opportunity to persuade a neutral decision maker that she had done nothing to warrant the destruction of her career, and that whatever case Lowe's had amassed against her was entirely pretextual and retaliatory.

## II.   Argument

### A.   Because Lowe's has materially breached the Arbitration Agreement, Mason is entitled to the remedy of rescission, and accordingly has no duty to submit her claims to binding arbitration.

Lowe's has asserted the Agreement's arbitration provision is mutual. But if that is so, then Lowe's also was required to resort to arbitration, and to do so *at the moment a controversy arose* between it and Mason. Indeed, Lowe's argues in its brief that "under the Agreement, both parties are compelled to arbitrate disputes", citing to the Agreement's language that both "***Mason 'and Lowe's agree[d]*** that *any controversy* between [her] and Lowe's … *arising out of* [her] *employment* or termination of [her] employment *shall be settled by binding arbitration*.'" (ECF 27 at

9)(emphasis in original and supplied). In making this argument, however, Lowe's calls attention to its own breach of the Agreement to arbitrate, because of its failure to invoke arbitration before firing Mason.

Hence, as alleged in the amended complaint, prior to Lowe's termination of Mason's employment a controversy arose which, according to Lowe's, warranted Mason's termination. In other words, and assuming its contentions are to be taken at face value, Lowe's apparently came to believe Mason was involved in some sort of theft. Mason, of course, denies engaging in theft. Nevertheless, rather than invoke arbitration to get to the bottom of the matter, Lowe's simply fired Mason. But by doing so, Lowe's nullified the Agreement to arbitrate.

If the arbitration agreement is indeed mutually binding, then Lowe's clearly breached it by firing Mason before submitting the dispute to arbitration. The starting point for this conclusion is Pennsylvania's law governing contract interpretation. When interpreting the language of a contract, the intention of the parties is paramount. *Thomas Rigging & Constr. Co., Inc. v. Contraves, Inc.,* 798 A.2d 753, 755 (Pa. Super. 2002). "In determining the intent of the parties to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly." *Meeting House Lane, Ltd. v. Melso,* 628 A.2d 854, 857 (Pa. Super. 1993).

When interpreting agreements containing clear and unambiguous terms, the court need only examine the writing itself to understand the parties' intent. *Osial v. Cook,* 803 A.2d 209, 213 (Pa. Super. 2002). Thus, if the language of a contract is unambiguous the court can determine its meaning "without any guide other than a

knowledge of the simple facts on which, from the nature of the language in general, its meaning depends." *Baney v. Eoute,* 784 A.2d 132, 136 (Pa. Super. 2001).

By comparison, when terms in a contract are not defined, the court "must construe the words in accordance with their natural, plain, and ordinary meaning." *Cordero v. Potomac Ins. Co. of Illinois,* 794 A.2d 897, 900 (Pa. Super. 2002). As the parties have the right to make their own contract, courts should not modify the plain meaning of the words under the guise of interpretation or give the language a construction in conflict with the accepted meaning of the language used. *Meeting House Lane, Ltd.,* 628 A.2d at 857.

If the written terms are reasonably or fairly susceptible of different constructions and are capable of being understood in more than one sense, then the contract might be ambiguous. *Cordero,* 794 A.2d at 900. Additionally, the language of a contract might be seen to be ambiguous, if the language is "obscure in meaning through indefiniteness of expression or has a double meaning." *Baney,* 784 A.2d at 136.

The Agreement's language clearly supports the conclusion that by firing Mason in the absence of invoking the arbitration clause, Lowe's is in breach. The starting point is the language of the Agreement identifying the matters to be settled by arbitration. The Agreement specifies that "Lowe's agree[s] *that any controversy* between [Mason] and Lowe's" shall be settled by arbitration. According to the Cambridge online dictionary, *controversy* is defined as "a disagreement, often a public one, that involves different ideas or opinions about something."[4] Obviously,

---

[4]https://dictionary.cambridge.org/us/dictionary/english/controversy

during the course of Mason's employment there arose a "disagreement...about something" that led Lowe's to take the step of firing her: Lowe's believed she had engaged in theft or some other unspecified "dishonesty" warranting discharge, while Mason knew she had done nothing of the sort, nor anything to justify her dismissal. Just as obviously, the disagreement constituted subject matter fully within the scope of the Agreement, which by its own terms purports to apply to any subject "arising out of [Mason's] employment." See, Agreement at 1 (ECF 25-2 at 2, ¶3)("This Agreement to Arbitrate Disputes *is intended to be broad* and *to cover*, to the extent otherwise permitted by law, *all such disputes between you and Lowe's*....")(emphasis added). Hence, the particular matter described by the controversy between Mason and Lowe's–according to the natural, plain, and ordinary meaning of *controversy*–was clearly employment-related.

Lowe's may argue that Mason's interpretation of the Agreement is extreme and not reasonable, because it necessarily leads to the conclusion that Lowe's gave up its right to treat Mason as a terminable-at-will employee.[5] But if the agreement to resort to arbitration is intended to be mutual, as Lowe's has conceded, it is reasonable to conclude Lowe's committed or agreed to modify the employment at-will relationship as well. Hence, if either party intended to end the employment based upon some "cause" that might arise from a "controversy" between Lowe's and Mason, the resolution was to be "settled" or resolved by submitting the matter to an arbitrator for decision. In other words Lowe's, per the Agreement, did not fire

---

[5] Pennsylvania law provides ample support for a finding that the additional consideration at issue in the Arbitration Agreement transformed Mason's status, such that she was no longer an employee terminable-at-will. See, Section C, infra.

Mason by exercising the prerogative to terminate at-will employees, but rather on the basis of some alleged cause.

To the extent Lowe's disagrees with the interpretation Mason offers here, several legal points must be recognized, none more dispositive than the maxim that contractual ambiguities are to be construed against the drafting party.  "Where the language of the contract is ambiguous, the provision is to be construed against the drafter." *Profit Wize Mktg. v. Wiest*, 812 A.2d 1270, 1275, ¶12 (Pa. Super. 2002) citing *Cordero,* supra, 794 A.2d at 900.

For Lowe's to contend the Agreement gave Mason the right to arbitrate, but only after she was fired, is to leave Mason's argument unanswered. On June 28, 2018, Lowe's unilaterally and permanently altered Mason's legal status. She was no longer its employee. The protection contained in the Agreement foreclosing such unilateral action had already been breached by Lowe's when it fired Mason without invoking arbitration. At that point, Mason had lost the benefit of the bargain.

Nor can Lowe's enforce an executory contract which Lowe's itself has materially breached. *Francis Gerard Janson, P.C. v. Frost*, 618 A.2d 1003, 1006 (1993), citing, *Walton v. PNB*, 545 A.2d 1383 (Pa. Super. 1988)("[W]here a contract is executory on both sides (as was the case here), *the party seeking the legal enforcement of the stipulations of the other party must show a compliance with his own*. In other words, that which is first to be performed must be done or tendered before the party who is to do it can sustain a suit against the other, citing 17A Am.Jur.2d, §§ 609, 470 ("in the case of a concurrent condition, there is no liability until the condition is performed or occurs.") [and] ... *where contractual promises or*

*covenants are mutual and dependent, the failure of one party to perform authorizes the other to rescind the contract*, 17A Am.Jur.2d, §§ 570, 574 (Interdependence of contractual provisions, in which a material breach occurs by one party, entitles the other party to rescind)..." (emphasis added). Mason, in other words, is entitled to the remedy of rescission, and to regard the Agreement between Lowe's and her as terminated.

Under the terms of the Agreement, Mason sacrificed her right to a jury trial. By doing so Mason furnished "additional consideration" to Lowe's, and as a consequence could no longer be considered its at-will employee.[6]

Lowe's cannot defeat this argument by contending it committed only an immaterial breach of the duty to submit controversies between itself and Mason to binding arbitration. As a general matter, whenever contractual performance is due, any nonperformance constitutes a breach. *Widmer Engineering, Inc. v. Dufalla*, 837 A.2d 459, 467-68 (Pa. Super. 2003). In those circumstances where a breach is deemed immaterial, and the contract has been substantially performed, the law regards the contract as remaining in effect. *Id.* 837 A.2d at 467, citing *Lane Enterprises v. L.B. Foster Co.*, 700 A.2d 465, 471 (Pa.Super.1997), *rev'd on other grounds*, 710 A.2d 54 (Pa. 1998).

---

[6]As stated by the Pennsylvania Superior Court in *Rapagnani v. Judas Co.*, 736 A.2d 666, 669 (Pa.Super. 1999), "The sine qua non of the [terminable-at-will] presumption is that except in rare instances, discharge will not be reviewed in a judicial forum.' In order to rebut the presumption of at-will employment, a party must establish one of the following: (1) an agreement for a definite duration; (2) an agreement specifying that the employee will be discharged for just cause only; (3) sufficient additional consideration; or (4) an applicable recognized public policy exception. *Id.*, citing *Luteran v. Loral Fairchild Corp.*, 688 A.2d 211, 214 (Pa. Super. 1997)

By contrast, in those circumstances where the breach is deemed material, the non-breaching party has no duty of further performance, and may regard the contract as terminated. *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 648 (Pa. 2009)(franchisor's immediate termination of franchise agreement justified notwithstanding explicit right-to-cure provisions, based on franchisee's material breach in diverting business to avoid reporting revenue and paying royalties); *Berkowitz v. Mayflower Sec., Inc.*, 317 A.2d 584, 586 (Pa. 1974)(material breach established where subscriber failed to pay price for stock shares stated in confirmation specifying number of shares, trade date, and settlement date); *Widmer Engineering, Inc.*, 837 A.2d at 467-68 ("If a breach constitutes a material failure of performance, then the non-breaching party is discharged from all liability under the contract.")(citing *Oak Ridge Const. Co. v. Tolley*, 504 A.2d 1343 (1985)).

Materiality of breach is a question of degree, and is generally determined by application of five factors, including the extent of deprivation to the injured party; whether the injured party can be adequately compensated; the degree of forfeiture the breaching party will suffer if the injured party is released from future performance; the breaching party's likelihood of curing the failure; and the extent to which the breaching party's conduct comports with standards of good faith and fair dealing. *Widmer Engineering, Inc.*, 837 A.2d at 468, citing *Gray v. Gray*, 671 A.2d 1166, 1172 (Pa. Super. 1996), *2401 Pennsylvania Avenue Corp. v. Federation of Jewish Agencies*, 466 A.2d 132, 139 (Pa. Super. 1983), and Restatement (Second) of Contracts § 241 (1981)(..."Whether a breach is so substantial as to justify an injured party's regarding the whole transaction as at an end 'is a question of degree; and it

must be answered by weighing the consequences in the actual custom of men in the performance of contracts similar to the one that is involved in the specific case.' ").

On the other hand, when the breach goes to the "essence" of the contract, this five-factor analysis is set aside. In *LJL Transp., Inc.,* supra, the Pennsylvania Supreme Court held that when a breach of contract goes directly to the essence of the contract, and irreparably damages the trust between the contracting parties, the non-breaching party "may terminate the contract without notice, absent explicit contractual provisions to the contrary." 962 A.2d at 648 ("...[S]uch a breach may not reasonably be cured [and] is so fundamentally destructive, it understandably and inevitably causes the trust which is the bedrock foundation and veritable lifeblood of the parties' contractual relationship to essentially evaporate. We find our law does not require a non-breaching party to prolong a contractual relationship under such circumstances.")(internal citations omitted).

The breach described here cannot be considered as anything other than going to the essence of the Agreement, given that Lowe's utterly defied the Agreement's *sole* purpose: to arbitrate any "controversy between [Mason] and Lowe's...arising out of [Mason's] employment." Thus, per the analysis stated in *LJL Transp., Inc.*, the breach was material, and Mason is entitled to regard the Agreement as nullified.

Application of *Widmer*'s five factors brings the same result. First, assuming Mason's allegations are true, it follows that no arbitrator would have found grounds to warrant her termination. And in that event, Mason would have thereby avoided the severe deprivations occasioned by Lowe's decision to destroy not only her career, but, as well, the resulting personal devastation visited upon Mason and her family;

the injury to their finances; and the laying to waste of the national standing and reputation she'd earned alongside her peers at Lowe's. Lowe's simply cannot restore Mason to the status quo ante, because Mason is no longer its employee.

Second, the potential for adequate compensation is fraught with difficult questions, chief among them how Mason might be made whole pending arbitration, given that she was deprived of performing work in FY 18/19 to the same degree that, in each prior year, had qualified her for the maximum bonus payout, as well as cash awards and other gifts conferred at the company's annual conventions. Moreover, the same inquiry would not be complete unless it calculated a cash award to compensate Mason for the severe emotional injury Lowe's inflicted in firing her, in addition to back pay dating to her June 28, 2018 discharge.

Third, and for these same reasons, the likelihood of cure pending arbitration is low.

Fourth, Lowe's cannot pretend it faces forfeiture in the event it were required to defend Mason's claims in court. Whatever defenses exist in an arbitral forum to Mason's claims are just as available to Lowe's if presenting this case to a jury.

Fifth, and finally, Lowe's did not comport with the standards of good faith and fair dealing in Mason's case. Not only did it fail to uphold its promise to have an arbitrator decide whether Mason deserved to lose her job, but did so specifically to conceal and thus further encourage the discriminatory and retaliatory acts of its high-ranking male employees.

**B.    Because Lowe's failed to provide the consideration it promised in exchange for Mason's acceptance of the Arbitration Agreement, Mason is entitled to the remedy of rescission, and accordingly has no duty to submit her claims to binding arbitration.**

Mason's demand that she be excused from arbitrating her dispute must be honored, because Lowe's failed to provide the consideration it promised as inducement for her acceptance of the Agreement.

As described in the Amended Complaint, Lowe's repurposed its performance-based bonus compensation to serve as consideration for the Arbitration Agreement it presented to Mason in March 2018. ECF 25, ¶¶100-06; 108. But three months after Mason had allegedly accepted the Agreement, and well before she could have met a single bonus threshold, Lowe's fired her. In doing so, Lowe's caused a failure of the promised consideration, an event that entitles Mason to the remedy of rescission, and relieves her of any duty to submit her claims to binding arbitration.

Failure of consideration occurs "when the consideration bargained for does not pass, in whole or in part, to the promisor." *McGuire v. Schneider, Inc.*, 534 A.2d 115, 118 (Pa. Super. 1987), *aff'd*, 543 A2d 1223 (Pa. 1988). "...[F]ailure of consideration does not contradict the terms of the instrument, but shows that the consideration contemplated was never received." *In re Levine's Estate*, 118 A.2d 741, 742-43 (Pa. 1955), quoting *In Re Killeen's Estate*, 165 A. 34, 35 (Pa. 1932)). Upon a finding of failure of consideration, this Court is empowered to grant Mason's request for rescission of the Agreement. *Umbelina v. Adams*, 34 A.3d 151, 158 (Pa. Super. 2011)(equity permits rescission of an executed contract upon grounds of fraud, mistake, failure of consideration, and quia timet).

Pennsylvania courts have recognized failure of consideration in numerous circumstances, including:

- a predecessor's withdrawal of assets promised to a successor corporation in exchange for the latter's agreement to assume the former's liabilities; see, *Krosnar v. Schmidt Krosnar McNaughton Garrett Co.*, 423 A.2d 370, 376 (Pa. Super. 1980)(withdrawal of assets "removed the consideration for which the liability was assumed…the assumption of the liability was no longer binding because of a failure of consideration.")(citing *Necho Coal Co. v. Denise Coal Co.*, 128 A.2d 771 (Pa. 1957) and Restatement of Contracts § 274);

- the failure of a deceased husband's estate to pay the balance of the husband's checking account, as promised to the widow in exchange for her post-nuptial agreement to waive potential claims against the husband's estate in the event he predeceased her; see, *Levine's Estate*, 118 A.2d at 742-43 (widow released from obligation in post-nuptial agreement to waive claim against deceased husband's estate after latter fails to provide consideration contemplated in post-nuptial agreement);

- a tenant's removal of improvements before surrendering the leasehold, for which the landlord had exchanged a $15,000 judgment note in anticipation of repossessing the leasehold with the improvements intact; see, *M.N.C. Corp. v. Mount Lebanon Medical Center, Inc.*, 509 A.2d 1256, 1259 (Pa. 1986).

As stated in *M.N.C. Corp.*, "Failure of consideration goes to the heart of *any* claim based on an agreement and is thus *always* available as a defense to that claim." *Id*. (citing, *Levine Estate*, 118 A.2d 741)(emphasis supplied).

Lowe's cannot establish Mason ever received the "consideration contemplated" in the Agreement, namely, her "participation in the 2018 Manager Bonus Program", because Lowe's fired Mason shortly after, and in retaliation for, her complaints of sex and age discrimination, thus rendering impossible her "participation" in the program. There can be no dispute in this case that in March 2018, when Mason was pressured into signing the Agreement, both she *and* Lowe's "contemplated" that if Mason were to serve out the year, she would earn many tens of thousands of dollars in bonus compensation based on her peerless performance as

16

a Store Manager in every year prior. Moreover, in March 2018 neither Mason nor

Lowe's could have *legitimately* contemplated that, barely three months later, Lowe's

would subject Mason to discharge in violation of federal and state law, well before

she had had the opportunity to qualify for even a single dollar in bonus pay.

**C.     Alternatively, because Lowe's failed to provide any consideration whatsoever in exchange for Mason's acceptance of the Arbitration Agreement, the Agreement is a legal nullity and Mason accordingly has no duty to submit her claims to binding arbitration.**

Alternatively, because Mason can demonstrate she received no consideration

in exchange for her assent, the Agreement is void ab initio.

In a recent case from the Eastern District, Judge Wendy Beetlestone

examined Pennsylvania jurisprudence regarding employment agreements collateral

or ancillary to the employment-at-will contract. *Crump v. MetaSource Acquisitions,*

*LLC*, 373 F.Supp.3d 540 (2019). After analyzing cases involving arbitration

agreements, incentive award agreements, non-compete agreements, and handbook

benefits, Judge Beetlestone distilled the principle linking all four: that in order for

these secondary contracts to be enforceable under Pennsylvania law, "new"

consideration must be shown. *Crump*, 373 F.Supp. 3d at 548-49.

In this case, Mason can demonstrate that she received no new consideration

in exchange for the Arbitration Agreement. To begin with, of the three elements the

Agreement identifies serving as consideration–the parties' mutual promises,

Mason's continued employment by Lowe's, and participation in the bonus

program–the second, due to its inherent ambiguity, is highly problematic. Lowe's

17

insists the phrase "your continued employment by Lowe's Home Centers, LLC..." be read as a promise of continued employment. But given the circumstances in which Lowe's presented the Agreement, and all that followed, it's difficult to see how this could be so. Indeed, as written the phrase reads just as easily as a threat to terminate any employee who rejected it. Nowhere in the Agreement did Lowe's include language declaring the consequences to Mason's tenure (as opposed to those afflicting her bonus) were she to withhold her assent. And given that Lowe's only obtained her signature after Becton's and Lombardo's badgering, Mason could not have reasonably drawn any conclusion beyond the likelihood that her tenure depended on her accepting Lowe's terms as stated in the Agreement.

To date, the Pennsylvania Supreme Court has left unresolved the question of whether continued employment suffices as consideration for an agreement to arbitrate. *Crump*, 373 F.Supp. 3d at 549. While Lowe's asserts that "courts in the Third Circuit have consistently held that continued employment is sufficient consideration for an arbitration agreement even if the employee is at-will", it fails to acknowledge that neither the case it cites, *Grant v. Philadelphia Eagles LLC*, 2009 WL 1845231 (EDPA 2009) nor any of the cases *Grant* and its progeny cite[7] rely on Pennsylvania law in support of the point. Indeed, if one is willing to look beyond

---

[7]See, *Wilson v. Darden Restaurants, Inc.*, 2000 WL 150872 (EDPA 2000)(Kelly, J.)*; Gutman v. Baldwin Corp.*, 2002 WL 32107938 (EDPA 2002)(Kelly, J.); *Grant v. Philadelphia Eagles LLC*, 2009 WL 1845231 (EDPA 2009)(Kelly, J.). Cf., *Crump* 373 F.Supp.3d at 548, n. 4. ("It is true that in *Blair*, the Third Circuit suggested that, where the terms of the arbitration agreement itself are illusory, continued employment may serve as alternative consideration sufficient to uphold an arbitration agreement. *Blair*, 283 F.3d at 604 n.3. However, the Third Circuit explicitly declined the resolve the issue, finding it to be unnecessary to the disposition of the case. *Id.* Accordingly, *Blair* does not control.")

Pennsylvania to resolve the matter, the case of *Clemmons v. Kansas City Chiefs Football Club, Inc.*, 397 S.W.3d 503, 508 n. 2 (Mo. Ct. App. 2013) is instructive, given its observation that the *Grant* opinion fails to support its conclusion that continued employment furnishes sufficient consideration for an agreement to arbitrate disputes.

After signing the Agreement, Mason either remained an employee terminable-at-will, or was transformed (by the Agreement) into one who could not be discharged at her employer's whim. If Mason's acceptance had no effect on her previous terminable-at-will status, then Lowe's supposed promise of "continued employment" was entirely illusory, and cannot serve as consideration. *Crump*, 373 F.Supp. 3d at 544-45 ("Under Pennsylvania law, "[i]f the promise is entirely optional with the promisor, it is said to be illusory and, therefore, lacking consideration and unenforceable. The promisor has committed him/herself to nothing.")(citations omitted).[8]

---

[8]Alternatively, supposing the phrase "your continued employment by Lowe's Home Centers, LLC..." truly represented a *promise*, then it must be construed as one that enjoined Lowe's from treating Mason as terminable-at-will for "for at least a reasonable period of time." *Harsco Corp. v. Zlotnicki*, 779 F.2d 906 (3C 1985)(employee's acceptance of employer's patent assignment agreement for no additional compensation constituted additional consideration prohibiting at-will discharge; "It is the settled law of agency that if the agent or employee furnishes a consideration in addition to his mere services, he is deemed to have purchased the employment for at least a reasonable period of time where the duration of employment is not otherwise defined.", *Id.* at 910, citing S. Williston, W. Jaeger, A Treatise on the Law of Contracts § 1017A (3d ed. 1967)); *Darlington v. General Electric*, 504 A.2d 306, 314 (Pa. Super. 1986), overruled on other grounds, *Clay v. Advanced Computer Applications, Inc.*, 559 A.2d 917 (Pa.1989)(employment no longer terminable-at-will following employee's furnishing of additional consideration)("When 'sufficient additional consideration' is present, courts infer that the parties intended that the contract will not be terminable at-will. This inference may be nothing more than a legal fiction because it is possible that in a

In this case, one does not have to strain to see how Lowe's conceptualized the effect on Mason's terminable-at-will status occasioned by the Agreement, as its summary dismissal of her on June 28, 2018 leaves no doubt.

As for the second purported basis of consideration, mutuality of promises, Lowe's cites the case of *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (2002) for the principle that adequate consideration exists "[w]hen both parties have agreed to be bound by arbitration." But as shown above, Lowe's bound itself to no more than an equivocation–an agreement to perhaps arbitrate disputes arising pre-termination, or perhaps not, and one that in any event it ignored at whim. As such, Lowe's made a promise that was no less illusory than the one at issue in *Crump*:

> As a general matter, 'an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory"...The agreement page specifically states that MetaSource need not give "notice at any time" of any modifications. Nor is there any term providing for the employee's acceptance of modifications. Nor is there any statement limiting the effect of any modifications to future incidents. Thus, the agreement permits MetaSource to change any of its obligations (other than at-will employment) at any time, simply by putting its desired changes in writing—without so much as telling its employees of these changes. In other words, MetaSource has the "unfettered discretion," to modify its arbitration obligations, *Blair*, 283 F.3d at 604, and has "committed [it]self to nothing," Because Metasource's obligation to arbitrate "is entirely optional," its promise to arbitrate is "illusory and, therefore, lacking consideration and unenforceable."

---

given case, the parties never truly contemplated how long the employment would last even though additional consideration is present. Even so, the at-will presumption would be overcome.").

The Agreement's failure to define a time period during which Lowe's could not terminate Mason at-will does not affect this analysis. *Martin v. Safeguard Scientifics, Inc.*, 17 F.Supp.2d 357 (1998)("In analyzing this type of claim, a fact finder need not conclude that the parties reached an actual agreement as to a definite term of employment in order to find that plaintiff has overcome the at-will presumption; if sufficient additional consideration is present, an agreement will be inferred." *Id.* at 369, citing *Darlington*, supra.

*Crump*, 373 F.Supp. 3d at 545-46 (citations omitted).

Finally, Lowe's cannot demonstrate that its supposed promise to Mason of "participation in the 2018 Manager Bonus Program" was anything other than an illusion, given that it never deviated from its prior prerogative to terminate Mason at-will and thereby nullify–in any meaningful way, and in any meaningful sense–her opportunity to earn bonus.

## D.      Defendants' remaining arguments are unavailing.

What remains of Defendants' arguments are unavailing. To begin with, Defendants insist the material facts are not in dispute, and thus their motion should be analyzed under Rule 12(b)(6) and not Rule 56. Defendants, of course, have yet to even answer Mason's amended complaint. More to the point, many issues remain in dispute, including the one Defendants themselves insist must be true: that the Agreement's reference to continued employment was not a threat to terminate Mason in the event she refused to sign. See, ECF 27 at 11; ECF 27-1 at 3-4, ¶4. Mason of course disputes this, just as she contends the finder of fact will not be able to reach a just decision regarding the harassment and threats Becton, Morone, and Stratton subjected her to, and how that evidence impacts her claims (of adhesion, unconscionability, coercion, fraud, breach of the duty of good faith and fair dealing, and agents acting beyond the scope of their authority) as each relates to the arbitration Agreement.

As a general matter, the disputes of fact in this case, of which there are presently many, with likely more to come, bar disposition of Defendants' motion

according to Rule 12(b)(6). *Bumbarger v. Credit One Financial*, 2016 WL 3087681,

*2 (WDPA 2016), Bissoon, J., citing, *Guidotti v. Legal Helpers Debt Resolution*,

L.L.C., 716 F.3d 764, 776 (3C 2013)("…[I]f the plaintiff has responded to a motion to

compel arbitration with additional facts sufficient to place the agreement to

arbitrate in issue, then 'the parties should be entitled to discovery on the question of

arbitrability before a court entertains further briefing on [the] question.'");

*International Diamond Importers, Ltd. v. Singularity Clark, L.P.*, 40 A.3d 1261 (Pa.

Super. 2012)(trial court's failure to submit disputed issues of fact regarding

materiality of breach constitutes abuse of discretion requiring reversal and

remand); *Hopkins v. New Day Financial*, 643 F.Supp.2d 704 (EDPA 2009)(jury trial

required to decide whether arbitration agreement is both procedurally and

substantively unconscionable); *Greene v. Oliver Realty, Inc.*, 526 A.2d 1192, 1202

(Pa. Super. 1987)(whether evidence adduced by employee defeats presumption that

he was terminable at will is question for jury).

As for the breach of the duty of good faith and fair dealing ("GFFD"),

Defendants fail to grasp that this case presents, not one, but *two* contracts between

Mason and Lowe's: (1) the at-will employment contract; and (2) the arbitration

Agreement. In its brief, Lowe's asserts an at-will employee cannot assert an action

for discharge in violation of the duty of GFFD. While Mason does not disagree,

Lowe's has entirely missed the point. Mason does not invoke the duty of GFFD as

grounds for a wrongful discharge claim. Rather, Mason invokes this duty as to the

promise contained in the *arbitration agreement*–specifically, the promise that in

exchange for her acceptance, Mason would "participate" in the FY 18/19 bonus program.

Mason asserts based on her past performance that both she *and Lowe's* "contemplated" in March 2018 that Mason would earn tens of thousands of dollars in bonus pay by the end of that year. But that outcome could not be achieved unless Lowe's, apart from the Agreement's explicit promises, had also implicitly obligated itself to take no illegal action against Mason that would forfeit her participation in the bonus program. Three months after she signed the Agreement, though, Lowe's did exactly that: it unilaterally terminated Mason's participation in the bonus program–before she had earned even a dollar in bonus pay–by firing her in retaliation for her Title VII-protected complaints against three high-ranking male employees of Lowe's (among other reasons, as stated in the amended complaint). Put simply, it is impossible to imagine a more blatant demonstration of bad faith and unfair dealing than the manner in which Lowe's proceeded against Mason, one of its highest performing and most loyal employees in the entire nation.

Pennsylvania case law provides numerous examples that support Mason's invocation of the duty of GFFD to deny Lowe's request for enforcement of the arbitration agreement, including *Germantown Mfg. Co. v. Rawlinson*, 491 A.2d 138, 148 (Pa. Super. 1985)(confessed judgment properly reopened upon evidence employer violated duty of good faith and fair dealing in setting amount owed by embezzling employee's spouse in judgment note); *Bedrock Stone and Stuff, Inc. v. Manufacturers and Traders Trust Co.*, 2005 WL 1279148 at *7-8 (EDPA 2005)(lender's unreasonable exercise of discretion authorized in loan contract

violates duty of good faith and fair dealing); and *Liazis v. Kosta, Inc.*, 618 A.2d 450, 454 (Pa.Super.1992)(reversing and remanding trial court's denial of petition to open confessed judgment in favor of lessor/seller of restaurant who locked out lessee/purchaser in tenth year of agreement following dispute over payments due)("Fundamentally, every contract imposes upon the parties a duty of good faith and fair dealing in the performance and enforcement of the contract.", citing, *Rawlinson*, 491 A.2d at 148 & Restatement (Second) of Contracts § 205).

Defendants' remaining arguments may be disposed of quickly. Defendants cannot be granted relief as to Mason's claim of adhesion. There is a material dispute in this case over the consequences that would have befallen Mason had she not signed the Agreement. While Defendants offer the entirely self-serving affidavit of Ms. League, Mason counters that not only was she badgered into signing the Agreement by Becton, who had subjected her to intolerable abuse, but that she reasonably construed the Agreement's reference to "continued employment" as a threat to fire her if she rejected it.

Similarly, Defendants' attack on Mason's claim of unconscionability fails. As this brief has demonstrated, the Agreement was grossly favorable to its drafter, Lowe's, given the latter's disregard at whim of the duties contained therein. *Hopkins*, supra.

Likewise, Defendants' cannot pretend Mason has failed to establish grounds for equitable estoppel. It is simply inconceivable and beyond absurd to suppose that Mason would have nonetheless pressed ahead with her complaints about Becton, Morone, and Stratton had she known what lie ahead–specifically, the destruction of

her career along with the loss of 70% over her base salary for FY 18/19. On the contrary, Mason would never have complained about Becton, Morone, and Stratton but for her reliance on Lowe's implicit promise that it would not retaliate against her for those same complaints.

Finally, whether the Agreement must be set aside due to coercion or fraud, or is otherwise unenforceable because the acts Mason complains of were committed by persons acting beyond the scope of their authority as agents of Lowe's, are questions that must be submitted to a jury following discovery in this case. *Bumbarger*, supra; *International Diamond Importers, Ltd.,* supra*; Hopkins,* supra*; Greene,* supra.

### III.    Conclusion

For the above reasons, Plaintiff respectfully requests the Court **DENY** Defendants' Motion to Compel Arbitration and to Dismiss or, in the Alternative, to Stay (ECF 26), and set this case for an initial Case Management Conference at its earliest opportunity.

Respectfully submitted,

/s/ Richard S. Matesic
Richard S. Matesic, Esquire
PA ID No. 72211

1007 Mount Royal Boulevard
Pittsburgh, PA 15223
412.492.8975/412.492.8978 (fax)
rs.matesic@verizon.net

Edward A. Olds, Esquire
PA ID No. 23601

Olds George Law
1007 Mount Royal Boulevard
Pittsburgh, PA 15223
412.492.8975/412.492.8978 (fax)
edolds@oldsruss.com

Attorneys for Plaintiff, Michelle Mason